IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| CHYANE KOLISH,<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>MARTIN O'MALLEY, Commissioner of<br>Social Security,<br><br>　　　　　　　Defendant. | CIV. NO. 23-00373 JMS-RT<br><br>ORDER REVERSING THE ALJ'S<br>DECISION AND REMANDING<br>FOR FURTHER PROCEEDINGS |

## ORDER REVERSING THE ALJ'S DECISION AND REMANDING FOR FURTHER PROCEEDINGS

## I.  INTRODUCTION

Chyane Makanakeola Kolish ("Plaintiff" or "Claimant") seeks judicial

review under 42 U.S.C. § 405(g) of a final decision of the Commissioner of Social

Security, Martin O'Malley ("Defendant" or "Commissioner").[1]  ECF No. 1.  The

Commissioner adopted Administrative Law Judge David Romeo's ("ALJ")

October 27, 2022 decision finding Plaintiff not disabled under § 216(i) and

§ 223(d) of the Social Security Act ("Decision").  Plaintiff argues the ALJ

committed legal error by finding a residual functional capacity ("RFC") not based

---

[1]  Martin O'Malley is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).  *See also* § 205(g) of the Social Security Act, 42 U.S.C. § 405(g) (providing that action survives regardless of any change in the person occupying the office of Commission of Social Security).

on substantial evidence by (1) failing to properly evaluate Kolish's symptom testimony and her testimony regarding her activities of daily living in light of the medical evidence of Plaintiff's (a) restrictive lung disease and asthma, and (b) thoracic and lumbar spine impairment; and (2) failing to properly evaluate the medical opinion evidence of the same ailments. *See* ECF No. 15 at PageID.1014–1032.

The court finds that the Decision's RFC is not based on substantial evidence as to at least Plaintiff's thoracic and lumbar spine impairment, and that the ALJ improperly discounted at least Dr. Lee and Dr. Puana's medical opinions. Accordingly, the court REVERSES the Commissioner's final decision and REMANDS for further proceedings.

## II. <u>BACKGROUND</u>

### A.    The Social Security Disability Determination Framework and the ALJ's Findings and Decision

Plaintiff, who alleges disability as of February 11, 2020, applied for Social Security Disability Insurance ("SSDI") benefits on April 29, 2020. Administrative Record ("AR")[2] 167.  Her claim was denied by the ALJ on October 22, 2022.  AR 17–35.  The ALJ determined that Plaintiff met the insured status

---

[2]  The AR is numbered sequentially from pages 1 to 971 and is available at ECF Nos. 8 through 8-8.

requirements of the Social Security Act through December 31, 2025.  AR 19.

Thus, the relevant period for the purposes of this appeal is after February 11, 2020,

when Plaintiff claimed she became disabled.  The ALJ's denial became the final

decision of the Commissioner when the Appeals Council denied Plaintiff's request

for review on August 21, 2023.  AR 1.

The Social Security Administration has established a five-step

sequential analysis to assess disability,[3] which asks:

> (1)     Has the claimant been engaged in substantial gainful
> activity?  If so, the claimant is not disabled.  If not, proceed to
> step two.
>
> (2)     Has the claimant's alleged impairment been sufficiently
> severe to limit his ability to work?  If not, the claimant is not
> disabled.  If so, proceed to step three.
>
> (3)     Does the claimant's impairment, or combination of
> impairments, meet or equal an impairment listed in 20 C.F.R.
> Part 404, Subpart P, Appendix 1?  If so, the claimant is
> disabled.  If not, proceed to step four.

---

[3]  A claimant is "disabled" for purposes of the Social Security Act if (a) he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months," and (b) the impairment renders him incapable of performing the work that she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  42 U.S.C. § 423(d)(1)(A) and (d)(2)(A); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

(4)     Does the claimant possess the residual functional capacity[4] to perform his past relevant work?  If so, the claimant is not disabled.  If not, proceed to step five.

(5)     Does the claimant's residual functional capacity, when considered with the claimant's age, education, and work experience, allow him to adjust to other work that exists in significant numbers in the national economy?  If so, the claimant is not disabled.  If not, the claimant is disabled.

*See, e.g.*, *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006) (citing 20 C.F.R. §§ 404.1520 (explaining the five-step sequential evaluation process used to decide whether a claimant is disabled), 416.920 (same)), *see also Woods v. Kijakazi*, 32 F.4th 785, 787 n.1 (9th Cir. 2022) (stating that the 2017 revised Social Security regulations do not alter the familiar "five-step sequential evaluation process," and that the purpose of 20 C.F.R. § 404.1520(a)(1) is to explain that process).  For Steps 1 through 4, the burden of proof is on the claimant, and if the claimant reaches Step 5, the burden shifts to the Commissioner.  *Tackett*, 180 F.3d at 1099.

At Step 1, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 11, 2020, the alleged onset date.  AR 19 (citing 20 C.F.R. § 404.1571 *et seq.*).

---

[4]  "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity." *Massachi v. Astrue*, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007) (citing 20 C.F.R. § 416.920(e)).  A plaintiff's RFC is "the most you can still do despite your limitations."  20 C.F.R. § 416.945(a)(1).

The ALJ then found at Step 2 that Plaintiff had the following severe impairments: asthma and restrictive lung disease, status post lobectomy in 1991; left thoracic/idiopathic scoliosis; brachial neuritis, lumbar facet pain/chronic pain syndrome; and depressive disorder.  AR 20 (citing 20 C.F.R. §§ 404.1520(c)).  He found that Plaintiff had other, non-severe impairments including "borderline/mild obstructive sleep apnea per a sleep study on July 10, 2021 . . . and gastroesophageal reflux in pregnancy" but noted that "an esophagogastroduodenoscopy showed erythema in the stomach body, but a normal esophagus and duodenum." *Id*.

At Step 3, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or is medically equal to the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id*. (citing 20 C.F.R §§ 404.1520(d), 404.1525, 404.1526).  The ALJ evaluated listings in sections 1.00 (Musculoskeletal Disorders), 3.00 (Respiratory Disorders), and 12.00 (Mental Disorders), but found that Plaintiff did not have the criteria to meet any of the listings.  AR 20–21.

Between Steps 3 and 4, the ALJ assessed Plaintiff's RFC.  He found that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b).  AR 23.  Light work "involves lifting no more

than 20 pounds at a time with frequent lifting or carrying of objects weighing up to

10 pounds."  20 C.F.R. §§ 404.1567(b) and 416.967(b).

> The ALJ determined that Plaintiff could perform light work except:
>
> occasional postural limitations; no concentrated exposure to
> vibration, hazards, heights, and respiratory irritants; can tolerate
> a low level of work pressure, defined as work not requiring
> multitasking, detailed job tasks, significant independent
> judgment, and a production rate pace; can tolerate occasional
> changes in workstation at the worksite, but no changes in the
> location of the worksite, occasional contact with coworkers and
> the public, and no shared work tasks; can understand,
> remember, and carry out simple instructions and make simple
> work-related decisions; and can work at a consistent pace
> throughout the workday, but not at a production rate pace where
> each task must be completed within a strict time deadline.

AR 23.

> At Step 4, the ALJ determined that Plaintiff "is unable to perform past

relevant work."  AR 33.

> At Step 5, the ALJ found that there were jobs that existed in

significant numbers in the national economy that Plaintiff could perform (given her

age, education, work experience, and RFC).  AR 34 (citing 20 C.F.R. §§ 404.1569

and 404.1569a).  The vocational expert testified that given Plaintiff's limitations,

she would have been able to perform the requirements of occupations such as

Routing Clerk and Photocopy Machine Operator.  *Id*.  Based on the vocational

expert's testimony, the ALJ found Plaintiff "not disabled."  AR 34–35.

**B.     Procedural Background**

On October 27, 2022, the ALJ issued his decision finding Plaintiff not disabled.  AR 35.  This denial became final when the Appeals Council denied Plaintiff's request for review on August 21, 2023.  AR 1.  Plaintiff brought this action for judicial review on September 6, 2023.  ECF No. 1.

Plaintiff filed her Opening Brief on March 6, 2024.  ECF No. 15.  Defendant filed an Answering Brief on April 1, 2024.  ECF No. 18.  Plaintiff filed her Reply Brief on April 18, 2024.  ECF No. 19.  The court held a hearing on May 20, 2024.  ECF No. 22.

## III.  <u>STANDARD OF REVIEW</u>

Congress has provided a limited scope for judicial review of the Commissioner's decision to deny benefits under the Social Security Act.  *See* 42 U.S.C. § 405(g); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014) ("For highly fact-intensive individualized determinations like a claimant's entitlement to disability benefits, Congress places a premium upon agency expertise, and, for the sake of uniformity, it is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency.") (internal quotation and citation omitted).

Guided by this principle, courts employ "three important rules" when assessing an ALJ's decision.  *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir.

2015).  First, courts "leave it to the ALJ to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record." *Id*. (quoting *Treichler*, 775 F.3d at 1098).  Second, courts will "disturb the Commissioner's decision to deny benefits 'only if it is not supported by substantial evidence or is based on legal error.'" *Id*. (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).  Substantial evidence means "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 522 (9th Cir. 2014) (internal quotation and citation omitted).  And, third, even where the ALJ commits legal error, courts uphold the ALJ's decision if that error is harmless. *Brown-Hunter*, 806 F.3d at 492.  An error is harmless if it is "inconsequential to the ultimate nondisability determination" or if "despite the legal error, 'the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity.'" *Id*. (quoting *Treichler*, 775 F.3d at 1099).

## IV.  <u>DISCUSSION</u>

This case concerns whether, in assessing the Plaintiff's RFC, the ALJ properly considered Plaintiff's testimony of asthma and severe chronic chest and back pain resulting from thoracic and lumbar spine impairment, and the medical evidence and opinions regarding those same two ailments.  Because it is

8

dispositive, the court addresses the ALJ's failure to adequately consider and discuss Plaintiff's chest and back pain resulting from thoracic and lumbar deformities as the basis for remand.[5]

## A.    Standards for Credibility Determination

"An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible." *Smith v. Kijakazi*, 14 F.4th 1108, 1111 (9th Cir. 2021).  At the first step, "the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."  *Id.* (quoting *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (internal quotation marks omitted)).  "At this step, the medical evidence need not corroborate the severity of the alleged symptoms; the medical evidence need only establish that the impairment could reasonably be expected to cause some degree of the alleged symptoms."  *Id.* (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)).  Then, if a claimant satisfies step one and there is no evidence of malingering, "[w]hen objective medical evidence is inconsistent with a claimant's subjective testimony, an ALJ can 'reject the claimant's testimony about

---

[5] Plaintiff explained at the hearing before the ALJ that her scoliosis and caved-in chest were complications of the removal of her right lower lung at birth.  AR 52.  Plaintiff's asthma may also be related to this initial surgery, but the court restricts its discussion to Plaintiff's chest and back pain symptoms because the ALJ's findings with regard to these symptoms are not supported by substantial evidence.

the severity of [his] symptoms only by offering specific, clear, and convincing reasons for doing so.'" *Smartt v. Kijakazi*, 53 F.4th 489, 494 (9th Cir. 2022) (quoting *Garrison*, 759 F.3d at 1014–15). "[A]n ALJ may not 'reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain.'" *Id.* at 494–95 (quoting *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005)).

Furthermore, "[a] finding that a claimant's testimony is not credible 'must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain." *Brown-Hunter*, 806 F.3d at 493 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 345–46 (9th Cir. 1991) (citation and internal quotation marks omitted)). In fact, "[g]eneral findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Id.* (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (citation and internal quotation marks omitted)); *see also Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("[T]he ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony."); *cf. Johns v. Berryhill,* 2019 WL 1453482, at *1 (D. Haw. Apr. 2, 2019) (reversing and remanding Commissioner's decision because ALJ failed to properly "specifically identify"

10

and discuss Plaintiff's pain and symptom testimony in rejecting her testimony and finding her not disabled).

## B.   The ALJ Did Not Provide Clear and Convincing Reasons for Rejecting Plaintiff's Testimony Regarding the Limiting Effects of her Symptoms

At step one of the two-step credibility analysis, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." AR 23. At step two, however, he found that "claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *Id.*

### 1.   *Plaintiff's Testimony*

During the hearing before the ALJ, Plaintiff testified as follows: Plaintiff's right lower lung lobe was removed at birth, which eventually caused chest deformity and scoliosis, both of which cause her chronic pain as an adult. AR 52. Around February 2020, she was hospitalized in the ICU as a result of these ailments and her restrictive lung disease (also a complication of the removal of her lung).[6] AR 48–52. Plaintiff has pain in her chest and back, and the back pain shoots down to her hips and starts to pinch the nerves to her legs. AR 52. She can

---

[6] During the hearing, the ALJ asked Plaintiff what happened in 2011 that took her out of work, but the reference to 2011 was likely scrivener's error. AR 51. Plaintiff was hospitalized in February 2020 and testified that she stopped working after that. AR 48–52, 304.

walk for around 15 minutes before needing to take a break.  *Id.*  During the break she would experience shortness of breath, chest tightness, and back pain.  AR 52–53.  After 15 minutes of walking she would have to rest for an hour before getting up.  AR 53.  She could sit in a desk chair for about 15 minutes in a "rotating-like position" to alleviate the pain, but would have to lie down afterward.  AR 53–54.  She cannot alleviate the pain from sitting by standing up, because it will cause pain and pressure from her legs up to her back.  AR 53.

Plaintiff testified that she has a limp.  AR 54.  She uses a cane or walker as needed and uses electric carts when grocery shopping.  AR 55.  Carrying up to 5 pounds will not aggravate her back pain, but she experiences sharp pain if lifting heavier weights.  AR 55–56.  Her chest will tighten up trying to carry a weight for a long period.  AR 56.  Bending her back causes her pain that goes down to her hip, pinching the nerves, which sometimes causes her leg to buckle or feel numb.  *Id.*  Back pain medication injections provide her relief for half her back at a time, and last for about an hour or an hour and a half.  AR 56–57.   She is never without pain.  AR 52.  She is trying to get back surgery but cannot afford childcare, and is trying to get disability so that she can pay for childcare while she recovers.  AR 57.

Plaintiff further testified that, prior to becoming pregnant, she took a combination of three pain medications twice a day for her back pain.[7]  AR 58.  The medications would cause her to become drowsy to the point of needing to sleep for two to three hours.  *Id.*  Her mother would come over and watch her son when she was experiencing these effects.  AR 59.  Because her mother worked the night shift, she could come over during the day.  *Id.*  Plaintiff testified that when her back pain flares up, she has difficulty concentrating.  AR 61.  In general, she is not able to keep up with housework or cooking, and relies on her mother's help.  *Id.*  She testified that minor tasks cause her "unbearable" pain but she does them because she needs to make sure her child's needs are met and sometimes her mother is unavailable to help:

> I can do little things . . . Of course me and my son need to eat.  I do depend on my mom a lot, but sometimes she has to go to her own doctors' appointments.  So, I need to make sure that I have a dish to eat off of.  Me and my son have clean clothes to wear.  So, I do have to – even though it's painful for me to do it, like I have to do it.  Like, it's unbearable, but I'll do anything for my son.

AR 61–62.

---

[7]  Plaintiff became pregnant with her first child in the spring of 2020.  *See* AR 90 (Plaintiff gave birth via C-section on January 12, 2021).  She resumed taking pain medications in February 2021, one month after giving birth.  AR 646.  At the time of the hearing, September 15, 2022, she was pregnant with her second child and was not taking back pain medication.  AR 58.

Plaintiff further testified that she experiences symptom flare-ups roughly once per month that incapacitate her in bed for about a week.  AR 60–61.  She can drive, but because of the pain she drives only to the doctor and to purchase water.  AR 47.

In Function Reports dated May 11, 2020, and February 18, 2021, Plaintiff stated that she does not lift heavy weights because the chest pain from her scoliosis will cut off her airway.  AR 216.  During her COPD (Chronic Obstructive Pulmonary Disease) flare-ups she is dependent on her partner to help her dress.  AR 217.  She says that she needs assistance making food and sometimes need help to walk to the bathroom.  *Id.*  She prepares "fast and easy" food such as "saimin, frozen food, pizza pocket, tuna sandwich" for herself daily.  AR 218, 248.  She is unable to stand and cook for long periods.  AR 248.  She spends 5–10 minutes cooking, and any dish that will take longer than that she will use an oven or crockpot to complete.  *Id.*  She has great difficulty doing housework, which causes pain and difficulty breathing.  AR 218–219.  She sometimes talks on the phone, does not go out on a regular basis, and stays home to be close to her nebulizer machine.  AR 220.  She can walk about half a telephone pole before needing 30 minutes of rest.  AR 221.  Over the course of an hour she is able to wash the dishes (15 minutes at a time), she can do this three times a day.  AR 248.  Wiping the counters and tables takes her ten minutes three times a day.  *Id.*  She is able to fold

14

laundry twice a week.  *Id*.  Her care for her pets is limited to keeping them from running away and she is "rehoming" them because she is unable to care for them without assistance.  AR 247.  Her spouse helps with her son and with the animals, and serves as her caretaker along with her mother.  *Id.*  She grocery shops every two weeks with assistance to carry, load and lift, for 30 minutes to one hour.  AR 249.

### 2.    *The ALJ's Findings*

The ALJ disbelieved Plaintiff:

> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because; despite the claimant's reported difficulty breathing, exercising, doing housework, driving, walking, bending, lifting, sitting, standing, one week a month where she is bedridden, pain, dizziness, blackouts, exhaustion, drowsiness, and nausea; the claimant also reported that she cares for her son, with help from her spouse and mother, she has no problem with personal care, she prepares her own meals daily, she does house and yard work of washing laundry twice a week, she does dishes for 15 minutes at a time, she wipes the counter and dining table daily for 10 minutes, and she shops in stores for groceries and household essentials every two weeks with assistance (9E).  She testified that her mom helps her with the housework.  She testified that, regarding housework, she can do little things as long as she does not exert herself; and even though it is painful for her to do it, she does it.

AR 24.  The ALJ then assessed an RFC of light work, that requires Plaintiff to be on her feet for 6 hours out of an 8-hour work day, and does not allow any breaks

that might allow her to lie down and rest after sitting or standing for 15 minutes, or to sleep after taking her pain medications.[8]  *See* 20 C.F.R. 404.1567(b) (Light work requires "a good deal of walking or standing"); Titles II and XVI: Determining Capability to Do Other Work—The Medical-Vocational Rules of Appendix 2, SSR 83-10 (S.S.A. 1983) ("SSR 83-10") (explaining that light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday).

### 3.   *Analysis*

The ALJ must explain either how Plaintiff's daily living activities contradict her other testimony, or explain how these activities meet the threshold for transferable work skills.  *See Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (describing "the two grounds for using daily activities to form the basis of an

---

[8]  As stated above, in full the ALJ found that:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b), except: occasional postural limitations; no concentrated exposure to vibration, hazards, heights, and respiratory irritants; can tolerate a low level of work pressure, defined as work not requiring multitasking, detailed job tasks, significant independent judgment, and a production rate pace; can tolerate occasional changes in workstation at the worksite, but no changes in the location of the worksite, occasional contact with coworkers and the public, and no shared work tasks; can understand, remember, and carry out simple instructions and make simple work-related decisions; and can work at a consistent pace throughout the workday, but not at a production rate pace where each task must be completed within a strict time deadline.

AR 23.

adverse credibility determination").  Because the ALJ does not mention how Plaintiff's daily living activities may be transferable to the work environment, the court construes the ALJ's comments as an explanation of how Plaintiff's activities contradict her symptom testimony.  But although the ALJ lists Plaintiff's symptoms, and then her daily living activities, he does so without explaining any contradiction between the two.  That is, because the ALJ does not "identify which of Plaintiff's activities [he] believed were inconsistent with which of Plaintiff's subjective complaints" his conclusory statements to the contrary are "legally insufficient."  *Marina M. v. Berryhill*, 2018 WL 5858400, at *3 (C.D. Cal. Nov. 6, 2018) (citing *Garrison*, 759 F.3d at 1016).

The court can see no obvious contradiction between the activities of daily living that the ALJ listed and Plaintiff's testimony.  *Garrison*, 759 F.3d at 1016 ("We have repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day."); *cf. Orn*, 495 F.3d at 639 ("This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to her overall disability.") (quoting *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001)).  *Garrison* is

17

instructive.  Similar to Plaintiff, the claimant in *Garrison* reported daily activities of talking on the phone, preparing meals, cleaning her room, and helping to care for her daughter, which the ALJ considered inconsistent with her testimony of debilitating neck and back pain.  *Id.* at 1015–1016.  The court disagreed: the claimant was heavily assisted by her mother in these tasks, was regularly prohibited by pain from doing certain household tasks, and after performing these tasks, she often had to rest—all of which were "fully consistent" with the pain that she described.  *Id.* at 1016.

Here, the ALJ made the same error—the ALJ's summary of Plaintiff's daily life activities implies that Plaintiff routinely did the housework, cooking, and shopping, but Plaintiff's testimony was that she could accomplish certain tasks, but only with significant assistance from her mother and partner, and typically in 15-minute increments punctuated by rest.  Plaintiff also testified that she endures a constant level of pain when doing childcare, and that she is able to manage the side effects of her medication (including having to sleep for two to three hours after taking her back pain medication) with her family's help.[9]  Given this context, the

---

[9] "Unfortunately, even when I watch my son, I do have triggers of pain to where I'm unable to focus, even when I'm trying to watch education videos with my son, it becomes really unbearable for me to be in the moment with him because the pain is just really excruciating. Fortunately I do have family that comes to help me and, you know, I can ask them to, you know, help me keep my son company while I, you know, have to take medications or I have to find relievement [sic] . . . in my pain."  AR 61.

18

fact that Plaintiff can do "little things" domestically is not inconsistent with her symptom testimony.[10]

The Commissioner provides two additional bases for the court to consider. ECF No. 18 at PageID.1038–1039. But, because these were not articulated by the ALJ, they cannot save the ALJ's decision from reversal. *Bray v. Comm'r*, 554 F.3d 1219, 1225 (9th Cir. 2009) (holding that courts cannot engage in "post hoc rationalizations that attempt to intuit what the [ALJ] might have been thinking"). Even so, they are unpersuasive.

First, the Commissioner argues that "[c]aring for an infant is a task that routinely requires lifting more than five pounds or sitting for more than 15 minutes," thus it contradicts Plaintiff's testimony that she cannot lift more than 5 pounds or sit for more than 15 minutes. ECF No. 18 at PageID.1038. But there is no contradiction—Plaintiff did not testify that she was unable to lift more than five pounds or sit for more than 15 minutes, she testified that she was unable to do so *without aggravating her back pain*. AR 53, 55–56. She also testified that generally, her mother could help with childcare during the day when Plaintiff had to rest because her mother worked the night shift. AR 59. If Plaintiff's family was

---

[10] Plaintiff cannot afford childcare, relies on family help, and functions through chronic pain or deleterious side effects while taking medication to accomplish the tasks necessary to care for her son. AR 57–59.

unable to help, for example, if her mother was attending a doctor's appointment during the day, she would function through pain in order to care for herself and her son.  AR 61–62.

        The Commissioner proposes a second contradiction in Plaintiff's testimony:  "Plaintiff said she was not able to keep up with the housework or cooking, although she could do little things . . . But Plaintiff elsewhere reported that she made breakfast, lunch and dinner every day and was able to prepare 'anything fast and easy' and that she 'did dishes and washed baby bottles three times every day, folded laundry twice a week, and wiped down the counter and table three times every day.'"  ECF No. 18 at PageID.1038–1039 (citing AR 248).

        There is no contradiction here either:  Plaintiff consistently testified that she can accomplish small tasks lasting up to 15 minutes in duration, but that she cannot keep up with housework and cooking on her own, and relies on help from her partner and mother to cover these responsibilities when she is seeking relief from her pain.  AR 61.  Her ability to cook simple meals is not evidence against severe chronic pain.  Plaintiff did not testify she was capable of preparing "anything," as long as it was fast and easy—she testified that the types of foods she typically prepared were "frozen foods, saimin, grilled cheese . . . anything fast and easy" and that she could spend at most five to ten minutes preparing food.  AR 248.  She was "unable to stand and cook for long periods" so "meal time has to be

kept short." *Id.*  In sum, Plaintiff's ability to do minor tasks throughout the day does not, without further explanation, invalidate her symptom testimony.

## C.     The ALJ Improperly Analyzed the Medical Evidence of Plaintiff's Spine Impairment and Resulting Pain

"The ALJ may use the medical record as a basis for discounting Plaintiff's testimony, but he must point to specific things in the medical records and 'describe how they contradict the claimant's testimony, and that explanation must be supported by substantial evidence.'" *Akiu v. Kijakazi*, 2023 WL 6311447, at *4 (D. Haw. Sept. 28, 2023) (quoting *Cyndi M.B. v. Kijakazi*, 2023 WL 5004496, at *3 (C.D. Cal. Aug. 4, 2023) (emphasis omitted)).  Here, the ALJ did not adequately describe how the parts of the medical record that he cited contradict the claimant's testimony.

The ALJ summarized the medical evidence that led him to reject Plaintiff's testimony of debilitating pain as follows:

> Despite the claimant's reported difficulty exercising, doing housework, walking, bending, lifting, sitting, standing, pain, exhaustion, drowsiness, and nausea; February to December 2021 and April and June 2022 exam findings showed no edema, stable gait, cranial nerves grossly intact, and no sensory deficiencies in the lower extremities (18F/2, 4; 26F/6, 9, 12, 14-15, 18, 21, 24, 27, 30).  June 2021 treatment notes by orthopedist and spine surgeon Jeffrey J. K. Lee, MD showed normal gait, lower extremity strength and sensation normal, negative straight leg raise, no pain with hip range of motion; with non-operative treatment prescribed and physical therapy recommended (27F/1, 2).  Follow up

21

> September, October, and December 2021 exams
> continued to show normal gait and lower extremity
> strength and sensation (27F/2, 3, 4).  November 12, 2021
> magnetic resonance imaging (MRI) of the thoracic spine
> showed severe thoracic and thoracolumbar scoliosis, but
> no signs of a disc herniation, spinal stenosis, or neural
> foraminal stenosis (27F/5).

AR 25.

With regard to the "February to December 2021 and April and June 2022 exam findings," which derive from Plaintiff's pain management doctor, Dr. Lynn Puana, the ALJ does not explain why a finding of "no edema, stable gait, cranial nerves grossly intact, and no sensory deficiencies in the lower extremities" is inconsistent with Plaintiff's reports of chronic pain.  After reporting these findings, Dr. Puana diagnosed Plaintiff with "thoracic and lumbosacral neuritis," "brachial neuritis," "chronic pain syndrome," "severe thoracolumbar scoliosis" and "other idiopathic scoliosis" and evaluated all of these ailments as "chronic and poorly controlled."  AR 647.  She noted that physical therapy provided "minimal relief" for Plaintiff's scoliosis pain.  *Id.*  She prescribed medications including Oxycodone, a potent opioid.  *Id.*  In March, she noted that Plaintiff's pain was still severe—she had "failed conservative therapies" and that medications "provide limited relief."  AR 649.  In May, Dr. Puana found that Plaintiff's thoracic and lumbosacral neuritis and brachial neuritis were "chronic stable" and meeting treatment goals, but that Plaintiff's "lumbar facet joint pain," "thoracic spine pain,"

22

"myalgia" and "chronic pain syndrome" remained poorly controlled.  AR 792.  In June, however, all of Plaintiff's ailments were assessed as poorly controlled once more, AR 795, and they remained poorly controlled through April 2022, AR 798. *See also* AR 810 (June 2021), AR 807 (August 2021), AR 804 (October 2021), AR 801 (December 2021).  Dr. Puana consistently prescribed medications and injections to treat Plaintiff's pain.  *See generally id.*  The ALJ does not explain how Dr. Puana's exam findings led him to conclude that Plaintiff's testimony regarding her pain was not credible.

The ALJ's analysis of Plaintiff's treatment notes of her surgeon, Dr. Jeffrey Lee, suffers from the same flaw.  The ALJ quotes certain findings from Dr. Lee's notes: "normal gait, lower extremity strength and sensation normal, negative straight leg raise, no pain with hip range of motion; with non-operative treatment prescribed and physical therapy recommended"—but again offers no explanation as to why they demonstrate Plaintiff is without pain.  AR 25 (citing AR 818–819). The ALJ does not mention Dr. Lee's assessment that Plaintiff had scoliosis and was not able to extend her lumbar spine at all.  AR 818 ("Lumbar [Flexion] 50, [Extension] 0.").  Dr. Lee noted she complained of a "8/10 nagging, sharp upper back pain" for ten years, and that it had increased in the last year to year and a half, and opined that Plaintiff's pain could be "ascribed to sagittal plane deformity." AR 818.

The ALJ then turns to Dr. Lee's follow-up reports, stating that they "continued to show normal gait and lower extremity strength and sensation."  AR 25.  But these reports also do not conclude Plaintiff was pain-free—they record "left thoracic scoliosis, mid back pain."  AR 819, 820, 821.  According to the September 2021 follow-up, Plaintiff was not considering surgery at that time, but in October 2021, Plaintiff began to consider surgery and requested an MRI because she continued to have pain despite physical therapy.  AR 820.  Similarly, while the MRI did not show a "disc herniation, spinal stenosis, or neural foraminal stenosis," it confirmed "severe" scoliosis.  AR 822.  And in December 2021, Dr. Lee identified a compression fracture of 60% in Plaintiff's spine.  AR 821.

Plaintiff's physical therapist also examined her gait and sensation, and the findings did not corroborate Dr. Lee's "normal gait" finding.  AR 923–25.  She found an "antalgic" gait and "pain with all spinal motions."  AR 924.  In contrast to Dr. Lee's assessment of "lower extremity strength and sensation normal, negative straight leg raise, no pain with hip range of motion," Plaintiff's physical therapist assessed that plaintiff was "slow with sit to stand"; had "difficulty turning over on treatment table"; had decreased lumbar range of motion in all axes; "difficulty with coming up from forward bend with back pain" and had "palpable tenderness or increased muscular tone."  AR 924–25.  When asked about Dr. Lee's assessment of her gait as "normal," Plaintiff explained that Dr. Lee had based his

24

assessment of her walk on her walking across the waiting room at his office, which was a "very short" walk; she noted that her physical therapist had observed her limp.  AR 54–55.

If, by noting that Dr. Lee first recommended "nonoperative treatment and physical therapy," the ALJ was implying that Plaintiff was prescribed a conservative treatment plan that belied her pain testimony, this too would be error.  Plaintiff was taking strong painkillers and injections from the pain management clinic.  The use of narcotics and injections for pain management are not conservative treatments.  *See Garrison*, 759 F.3d at 1015 n.20 (expressing "doubt that epidural steroid shots to the neck and lower back qualify as 'conservative' medical treatment"); *Revels v. Berryhill*, 874 F.3d 648, 667 (9th Cir. 2017) (holding that prescription of "a variety of medications for [] pain" along with facet and epidural injections was not conservative treatment).

In sum, the ALJ has provided no explanation why Dr. Lee's findings on Plaintiff's gait, cranial nerves, and sensation in the lower extremities refute her testimony regarding disabling back pain.  Severe scoliosis is well known to cause back pain, as are compression fractures.[11]  Because the ALJ did not explain how

---

[11]  *Scoliosis*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/scoliosis/symptoms-causes/syc-20350716 [https://perma.cc/63K5-KLLG]; *Compression Fractures*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/osteoporosis/multimedia/compression-fractures/img-20008995 [https://perma.cc/RX9F-TR5U].

the exam findings contradicted Plaintiff's testimony, the court cannot determine

whether the ALJ arbitrarily discredited Plaintiff's pain testimony. *Brown-Hunter*,

806 F.3d at 493.

**D.   The ALJ Improperly Discounted Medical Opinions by Dr. Puana and Dr. Lee**

        The revised Social Security regulations which apply to claims filed

after March 27, 2017, preclude an ALJ from deferring to or giving "any specific

evidentiary weight, including controlling weight, to any medical opinion(s) or prior

administrative medical finding(s), including those from [a claimant's] medical

sources." *Howard v. Kijakazi*, 2023 WL 6141372, at *5 (D. Haw. Sept. 20, 2023)

(quoting 20 C.F.R. § 404.1520c(a) (internal quotation marks omitted)).[12]  And

although an ALJ must articulate how persuasive he finds all the medical opinions[13]

---

[12]  Prior to the revised regulations, ALJs were required to give greater weight to the opinions of treating physicians than to the opinions of examining physicians, and to assign greater weight to opinions of examining physicians than to opinions of non-examining physicians. *Farlow v. Kijakazi*, 53 F.4th 485, 488 (9th Cir. 2022) (citing *Lester v. Chater*, 81 F.3d 821, 830–31 (9th Cir. 1995), *superseded on other grounds by regulation*, Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5852 (Jan. 18, 2017) (codified at 20 C.F.R. pts. 404 & 416), *as recognized in Woods*, 32 F.4th at 789–90).

[13]  "A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions . . . ."  20 C.F.R. § 404.1513(a)(2); *see also Woods*, 32 F.4th at 789 n.2 ("[M]edical opinions" is comprised of evidence from any "acceptable medical source": medical professionals other than physicians, such as psychologists and certain advanced practice nurses and physician assistants (citing 20 C.F.R. § 404.1502(a)(2), (7), (8)); 20 C.F.R. § 404.1527(a)(1) (former regulation defining "medical opinions" as "statements from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s)"); *id.* § 404.1521 (current regulation requiring "objective medical evidence from an acceptable medical source")).

26

or all the prior administrative medical findings,[14] he may do so in a single analysis considering certain factors; that is, he is not "required to articulate how [he] considered each medical opinion or prior administrative medical finding from one medical source individually." *Id.* (quoting 20 C.F.R. § 404.1520c(b) (internal quotation marks omitted)).

An ALJ must consider a medical opinion's supportability, its consistency, and the relationship between the source and the claimant, among others. *See* 20 C.F.R. § 404.1520c(c)(1)–(5).  Supportability and consistency are the most important factors an ALJ must consider—and explain that they were considered—when determining how persuasive the ALJ finds a medical opinion or prior administrative medical finding.  *See* 20 C.F.R. § 404.1520c(c)(1) and (2);[15]

---

[14] "A prior administrative medical finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review . . . in your current claim based on their review of the evidence in your case record . . . ."  20 C.F.R. § 404.1513(a)(5) (describing categories of evidence).

[15] "We will consider the following factors when we consider the medical opinion(s) and prior administrative medical finding(s) in your case:

(1) Supportability.  The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) Consistency.  The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."

(continued . . .)

27

*see also Stiffler v. O'Malley*, – F. 4th –, 2024 WL 2715884, at *3 (9th Cir. May 28, 2024) ("Ultimately, the ALJ 'must articulate how persuasive it finds all of the medical opinions from each doctor or other source, and explain how it considered the supportability and consistency factors in reaching these findings.'") (quoting *Woods*, 32 F.4th at 792); *Kitchen v. Kijakazi*, 82 F.4th 732, 739–740 (9th Cir. 2023).

"Supportability focuses on whether 'a medical source supports the medical opinion by explaining the relevant objective medical evidence.'" *Stiffler*, 2024 WL 2715884, at *3 (quoting *Woods*, 34 F.4th at 791–92). "Consistency means the extent to which a medical opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim.'" *Id.* (quoting *Woods*, 34 F.4th at 792). Under the revised regulations, an ALJ must articulate his reasoning, addressing how he considered the consistency and supportability factors. *Howard*, 2023 WL 6141372, at *6 (citation omitted). And he "must do so in sufficient detail to allow a reviewing court to determine whether that reasoning is free of legal error and supported by substantial evidence." *Id.* (citation and internal quotation marks omitted).

---

20 C.F.R. § 404.1520c(c)(1) and (2).

The ALJ discounted Dr. Lee and Dr. Puana's medical opinions regarding Plaintiff's pain.  But the ALJ fails to explain his reasoning in the manner required by 20 C.F.R. § 404.1520c(1)–(5).  He rejects both opinions on the same basis, stating that they are

> not well supported by Dr. Lee's exam findings of normal gait, lower extremity strength and sensation normal, negative straight leg raise, no pain with hip range of motion (27F/1, 2, 3, 4); nor consistent with Dr. Puana's exam findings of no edema, stable gait, cranial nerves grossly intact, no sensory deficiencies in the lower extremities (18F/2, 4; 26F/6, 9, 12, 14-15, 18, 21, 24, 27, 30); and no signs of a disc herniation, spinal stenosis, or neural foraminal stenosis on imaging (27F/5); and the state agency medical consultant's findings (2A; 4A).

AR 30–31.

In other words, in attempting to evaluate the supportability of the two medical opinions, the ALJ repeats the same medical evidence he used as justification for rejecting Plaintiff's symptom testimony.  But again, he fails to explain how this evidence contradicts the two doctors' opinions.  The ALJ appears to have concluded that the findings quoted above somehow demonstrate that Plaintiff did not have pain and was capable of light work—in contravention of Dr. Puana and Dr. Lee's opinions that Plaintiff was in pain and that her pain would make it prohibitively difficult for her to work.  AR 680–683 (Dr. Puana opinion); AR 685–688 (Dr. Lee opinion).  But without any explanation connecting the

29

medical evidence with Plaintiff's medical conditions and symptoms, the ALJ cannot reject these opinions as unsupported.

The ALJ's discussion of Dr. Puana and Dr. Lee's opinions' consistency with other medical and non-medical evidence in the record is also insufficient. 20 C.F.R § 404.1520c(c)(2) explains that "the more consistent a medical opinion[] . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] . . . will be." The ALJ remarks that Dr. Lee and Dr. Puana's opinions are not supported by the opinion of the state medical consultants Dr. Neil Shibuya and Dr. Stacy Lau. AR 30. But he does not explain why this inconsistency supports rejecting Dr. Lee and Dr. Puana's opinions—which were consistent with Plaintiff's testimony and Function Reports, as well as the opinion of her physiotherapist.[16]

The ALJ's only reasoning for finding the state medical consultants' opinions persuasive was that they were:

> well supported by the consultants' findings, and
> consistent with the objective evidence of record . . .

---

[16] In addition to consistency and supportability, 20 C.F.R § 404.1520c(c)(3) requires the ALJ to consider the "relationship with the claimant" factor, which in turn includes the "[l]ength of the treatment relationship," "[f]requency of examinations," "[p]urpose of the treatment relationship" and "[e]xtent of the treatment relationship." Although the ALJ did not explicitly discuss this factor—and is not required to, per 20 C.F.R § 404.1520c(b)(2)—the record shows that the state medical consultants did not examine Plaintiff and based their findings only on the materials included in Plaintiff's disability claim. AR 77, 89–90. In contrast, Dr. Puana and Dr. Lee each examined Plaintiff on a number of occasions. *See* AR 787–817 (Dr. Puana's examination records); AR 818–822 (Dr. Lee's examination records).

including findings of: . . . no edema, stable gait, cranial
nerves grossly intact, no sensory deficiencies in the lower
extremities (18F/2, 4; 26F/6, 9, 12, 14-15, 18, 21, 24, 27,
30); normal gait, lower extremity strength and sensation
normal, negative straight leg raise, no pain with hip range
of motion; with nonoperative treatment prescribed and
physical therapy recommended (27F/1, 2, 3, 4); and no
signs of a disc herniation, spinal stenosis, or neural
foraminal stenosis (27F/5).

AR 29.

Thus, to explain why he credited Dr. Shibuya and Dr. Lau's opinions,

the ALJ has repeated the exact same list of findings that purportedly made Dr.

Puana and Dr. Lee's findings unsupportable—again, without connecting these

findings to the medical opinions. This is insufficient.

The court can discern no reason that an inconsistency between Dr.

Puana and Dr. Lee's opinions and the state medical consultants' opinions would

weigh in favor of disregarding the former. Dr. Shibuya credits Plaintiff's diagnosis

of scoliosis, and notes that "tenderness and spasm" were present with "painful

[range of motion]" but "normal neuromuscular function and gait." AR 77. He also

notes that Plaintiff could "care for pets, cook, clean, do laundry, do chores all day,

shop, garden, walk 1/2 telephone pole length" and concludes that her activities of

daily living were "consistent with light functioning." *Id.* Similarly, Dr. Lau

assesses "severe scoliosis," but states that Plaintiff has "no problems w/personal

care, cares for newborn, prepares meals, washes dishes, does laundry, drives,

shops, lifts 10 lbs.  Walks w/o hand held."  AR 90.  Dr. Lau also notes that Plaintiff

walks three miles once a week.  AR 90.

Both state medical consultants' opinions rely on Plaintiff's Function

Reports, but the Function Reports conflict with the consultants' assessments in

important respects.  AR 77, 89–90.  Plaintiff made it clear she does not garden—

she wrote, "[I] would love to have a garden and grow my own fruits and

vegetables.  I draw and plan to garden I don[']t do it yet and haven[']t yet due to

condition.  I just draw and imagine what it could be like."  AR 250.  Plaintiff

indicated she could do certain chores but that she "depends on any available help

for her daily routines including laundry, dishes, cleaning, and driving to the

doctors."  AR 246.  The court cannot locate any support in the record for the

statement that Plaintiff can do chores "all day."  Plaintiff wrote that she required

"electric cart and assistance" to do grocery shopping.  AR 251.  Her care for her

pets was limited to "watch[ing] them from running away from home"; she stated

that she planned to rehome them because after her condition worsened she was no

longer able to care for them without assistance.  AR 247.

As to Dr. Lau's note that Plaintiff walks three miles once a week for

exercise, this observation is clearly inconsistent with Plaintiff's statement in her

Function Reports that she could walk only 1/2 a telephone pole.  AR 221.  It

appears to be based on a notation in the medical reports of Dr. Melissa Kuwahara,

Plaintiff's OB/GYN.  AR 841.  It is in a section entitled "social history," that discusses whether Plaintiff had smoked, consumed alcohol, or done drugs in the past.  *Id.*  In context, it appears that this exercise regimen was also historical, and that Plaintiff did these walks before the worsening of her condition that led her to apply for disability.

Because the ALJ did not explain why the inconsistency between Dr. Puana and Dr. Lee's opinions and the state medical consultants' opinions should result in disregarding the former opinions—and because the medical consultants' opinions have supportability problems on their face—the ALJ's consistency analysis is insufficient.

Having failed to properly analyze Plaintiff's testimony and medical evidence demonstrating thoracic spine and chest impairment (and resulting pain symptoms), and having improperly disregarded Dr. Puana and Dr. Lee's opinions, the ALJ's RFC is not based on substantial evidence.  The ALJ assessed an RFC requiring Plaintiff to be on her feet for six out of eight hours a day, and to lift up to 20 pounds.  *See* AR 23; 20 C.F.R. § 404.1567(b); SSR 83-10.  Because substantial evidence does not support the RFC, the determination at Step 5 that there were other jobs in the economy that Plaintiff could do, and the consequent finding that

Plaintiff was not disabled on the date last insured, are also not supported by substantial evidence.  Remand is required.[17]

## V.  <u>CONCLUSION</u>

For the foregoing reasons, the court REVERSES the ALJ's Decision and REMANDS this action for further proceedings consistent with this Order.  The Clerk of Court is instructed to close the case file.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, June 7, 2024.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Kolish v. O'Malley*, Civ. No. 23-00373 JMS-WRP, Order Reversing the ALJ's Decision and Remanding for Further Proceedings

---

[17]  The Commissioner did not argue that this error was harmless, and clearly it was not. "[A]n ALJ's error is harmless where it is inconsequential to the ultimate nondisability determination."  *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (internal quotation marks and citation omitted), *superseded on other grounds by* 20 C.F.R. § 404.1502(a).  In making this assessment, the court "look[s] at the record as a whole to determine whether the error alters the outcome of the case."  *Id.*  Here, the failure to take Plaintiff's pain testimony into account in the RFC likely "alter[ed] the outcome of the case"—as explained above, the RFC made no accommodation for Plaintiff's need to lie down after standing or sitting for fifteen minutes or for breaks to accommodate drowsiness caused by pain medication.  Allowances for these symptoms would undoubtedly have restricted or eliminated the available jobs for an individual with Plaintiff's limitations.  *See, e.g.*, AR 66 (vocational expert denying the existence of work for hypothetical individual with Plaintiff's limitations).